IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 17, 2007 Session

**GILBERT MOHR v. DAIMLERCHRYSLER CORPORATION**

**Appeal from the Circuit Court of Shelby County**
**No. CT002433-03      Robert Childers, Judge**

_____

**No. W2006-01382-COA-R3-CV - Filed October 14, 2008**

_____

This appeal is from a jury verdict against an automobile manufacturer for compensatory and punitive damages. The Circuit Court of Shelby County entered judgments against the defendant for $3,450,000 in compensatory and $48,778,000 in punitive damages for the death of the driver, and $1,100,000 in compensatory damages for the death of the front-seat passenger. The manufacturer on appeal asks this Court to reverse the judgment of liability or to grant a new trial on all issues. In the alternative, the defendant argues that the money judgments are excessive. We affirm the findings of liability for compensatory and punitive damages and we affirm the amounts awarded for compensatory damages. We also find that the amount of punitive damages awarded must be reduced to $13,800,000 to comply with the due process requirements of the United States Constitution.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court affirmed in part and Modified in Part.**

Ben H. Cantrell, SP.J. delivered the opinion of the Court in which Alan Highers, P.J. W.S. and Holly Kirby, J. concurred.

Theodore J. Bourtrous, Dominic Lanza, Joy Day, Lawrence A. Sutter, and J. Britt Phillips for the appellant, DaimlerChrysler Corporation.

Richard E. Charlton, III, Larry W. Morris, Jeremy Knowles and Gene Hamby for the appellee, Gilbert Mohr.

1

## OPINION

## I.  FACTS AND PROCEDURAL HISTORY

This action arose from  a "frontal off-set" collision between a 2000 Dodge Caravan and a 1995 Jeep Cherokee on Highway 67 near Corning, Arkansas.  On July 5, 2002, Vickie Mohr drove the Caravan with her mother, Maurine Heathscott, in the front passenger seat.  Her sister, Carolyn Jones, was in the rear seat directly behind the driver, and her daughter, Victoria Mohr, was in the rear seat behind her grandmother.  Brett McAfee, the driver of the Cherokee traveling in the opposite direction, fell asleep and his vehicle crossed the center line into the oncoming lane.  He sideswiped a pickup truck and then crashed into the Mohr vehicle, which had pulled onto the shoulder of the road in an effort to avoid the collision.  The Cherokee was traveling at a speed of less than thirty-five miles per hour at the time of the impact.  The initial impact was at the left front of the Caravan over to a point about four inches from the center of the vehicle.  Ms. Mohr and Ms. Heathscott died as a result of injuries suffered in the wreck.  Ms. Jones and Victoria Mohr suffered significant injuries.  Mr. McAfee was not seriously hurt.

On April 30, 2003, Gilbert Mohr filed this action in the Circuit Court of Shelby County against the manufacturer of the vehicles, the corporation providing financing, and the dealer that sold the Dodge Caravan.  He sued as administrator of the estates of Ms. Mohr and Ms. Heathscott and as the father and next friend of Victoria Mohr.  Ms. Jones joined the action as an additional plaintiff on her own behalf.  The complaint sought both compensatory and punitive damages.

The plaintiffs' theories included negligence, strict liability and breach of warranty, and accused DaimlerChrysler of willful, wanton and reckless conduct.  The complaint sought fifteen million dollars in compensatory and punitive damages for the death of Ms. Mohr, a like amount each for the death of Ms. Heathscott and the injuries to Ms. Jones and five million dollars for the injuries to Victoria Mohr.  Ultimately, the plaintiffs non-suited the other defendants and proceeded solely against DaimlerChrysler Corporation (DCC), the manufacturer of the Dodge Caravan.

The proof about how the accident happened, the damage to the Caravan, and the injuries to the occupants was mostly undisputed.  The struggle during the trial was over the proof concerning whether the Caravan was defective and unreasonably dangerous and whether DCC (1) knew that it was defective and dangerous, (2) did nothing to correct it, and (3) actually rigged the tests to show compliance with federal standards.

On February 14, 2005, the jury returned its verdict on the liability and compensatory damage issues.  In the case for the wrongful death of Vickie Mohr, the jury returned a verdict finding that the Caravan was defective and dangerous, that DCC was negligent and that DCC was guilty of a breach of warranty.  The verdict assigned the fault for Ms. Mohr's death as follows: 46% to DCC; 45% to Brett McAfee, the driver of the Jeep Cherokee; and 9% to Ms. Jones, the passenger in the rear seat

behind Ms. Mohr. Ms. Jones was not wearing a seat belt and she pitched forward striking Ms. Mohr's head from behind. The jury set the total compensatory damages for Ms. Mohr's death at $7.5 million and found by clear and convincing evidence that DCC had acted intentionally or recklessly.

In the case for the wrongful death of Ms. Heathscott, the jury reiterated its finding that the Caravan was defective and unreasonably dangerous because of a defective seat belt, and that DCC was negligent and committed a breach of warranty. The jury attributed 55% of her damages to DCC and 45% to Brett McAfee. Ms. Heathscott was found to be free of fault. The verdict set her total damages at $2 million. But as to her, the jury absolved DCC of any reckless or intentional conduct.

In the case for the injuries to Victoria Mohr, the jury attributed all the fault to Brett McAfee.

In Carolyn Jones' case, the jury found that her injuries were caused by her own fault and that of Brett McAfee equally.

On February 16, 2005, plaintiff moved the trial court to amend the ad damnum clause of the complaint to $50 million. The Court then proceeded to conduct a hearing on the amount of the punitive damages to be awarded for the wrongful death of Vickie Mohr. After hearing the proof and the Court's instructions, the jury returned a verdict against DCC in the amount of $48,778,000. The trial judge approved the verdict for punitive damages and entered his written findings in the record.

The Court entered a final judgment on the jury verdicts, awarding $3,450,000 in compensatory damages and $48,778,000 in punitive damages for the death of Vickie Mohr. For the death of Ms. Heathscott, the Court entered a judgment for $1,100,000 in compensatory damages. The claims of Victoria Mohr and Carolyn Jones were dismissed.

On appeal, DCC asks this Court to dismiss the claims of Vickie Mohr because the evidence does not show (1) that the Caravan was defective or (2) that DCC's conduct merits an award of punitive damages. In addition, DCC asks this Court to dismiss the claim of Ms. Heathscott because the evidence does not show that DCC's fault caused her death.

Alternatively, DCC asks the Court to remand the case for a new trial because of the lower court's errors in allowing the admission of incompetent evidence and in allowing plaintiff's counsel to make inflammatory and unfounded accusations of DCC's wrongdoing.

DCC also seeks a new trial because the award of compensatory damages may have been made for breach of warranty which would not support an award of punitive damages.

Finally, DCC seeks a reduction in the award for the wrongful death of Vickie Mohr because the verdicts are excessive and exceed the complaint's ad damnum clause.

3

## II.  THE STANDARD OF REVIEW

Before turning to the issues in this case, we first note that this Court's review of the judgment entered on the jury's verdict is governed by Tenn. R. App. P. 13(d).  It provides that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict."  Under this standard of review, we "are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict."  *Crabtree Masonry Co. V. C & R Constr., Inc.,* 575 S.W.2d 4, 5 (Tenn. 1978).  In making this determination, we are "required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary."  *Id.*  If the record contains any material evidence to support the verdict, we must affirm the trial court's judgment.  *See id.; accord Forrester v. Stockstill*, 869 S.W.2d 328, 329 (Tenn. 1994).  Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trier of fact, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues.  *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997).  The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier or fact, and the credibility accorded will be given great weight by the appellate court.  *See id.*; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

## III.  WAS THE CARAVAN DEFECTIVE?

### A.

Under the Tennessee Products Liability Act, T.C.A. §§ 29-28-101 to 108 (2000), a manufacturer or seller of a product may be held liable for an injury caused by its product only if the "product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller."  T.C.A. § 29-28-105.  Consequently, a plaintiff must show either that a product is defective or that it is unreasonably dangerous.  A product is considered "unreasonably dangerous" if:

> [the] product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

4

T.C.A. § 29-29-102(8). However, a product is not unreasonably dangerous because of a failure to adequately warn of a danger or hazard that is apparent to the ordinary user. T.C.A. § 29-28-105(d).

A "defective condition" is defined as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." T.C.A. § 29-28-102(2). The legislature has decided that, in making the determination of whether a product is defective or unreasonably dangerous, "the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is also given to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products." T.C.A. § 29-28-105(b). In order to establish a defect in a product, the plaintiff must "trace the injury to some specific error in construction or design of the [product]...." **Browder v. Pettigrew**, 541 S.W.2d 402, 404 (Tenn. 1976). A defect in a product, as well as any other material fact, may be proven by direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. **Id.** at 405.

However, the actual design of the product does not have to be perfect, accident proof, or incapable of causing injury to be considered non-defective. **See, e.g., Curtis v. Universal Match Corp.**, 778 F. Supp. 1421, 1430 (E.D. Tenn. 1991) ("where it is simply shown that there is a better, safer, or different design which would have averted the injury, this does not establish that there has been a departure from the required standard of care"); **Fulton v. Pfizer Hosp. Products Group, Inc.**, 872 S.W.2d 908, 912 (Tenn. Ct. App. 1993)("a manufacturer is not an insurer of a product that is accident proof, or incapable of causing injury"). The basis for this theory is found in **Kerley v. Stanley Works**, 553 S.W.2d 80, 84 (Tenn. Ct. App. 1977), where this Court in relying upon 72 C.J.S. Products Liability§ 21, found that:

> A manufacturer, ... is not an insurer of the product he designs, and it is not required that the design adopted be perfect, or render the product accident proof, or incapable of causing injury, nor is it necessary to incorporate the ultimate safety features in the product. Hence, a departure from the required standard of care is not demonstrated where it is simply shown that there was a better, safer, or different design which would have averted the injury.

**B**.

DCC proved that the Caravan fully complied with all federal standards for crashworthiness, exceeding the occupant injury criteria of the Federal Motor Vehicle Safety Standard (FMVSS) 208 by substantial margins. In addition, the Caravan had been subjected to the National Highway Traffic Safety Administration's (NHTSA's) more rigorous New Car Assessment Program (NCAP). NCAP tested the car under conditions that generated 35 to 36 percent more energy that had to be managed in the crash, and even under those conditions the Caravan passed the FMVSS 208 test. Compliance

5

with FMVSS 208 creates a rebuttable presumption that the Caravan was not unreasonably dangerous. Tenn. Code Ann. §29-28-104.

Evidence of other accidents also has a bearing on the question of whether the product is dangerous. Conversely, the absence of other accidents tends to negate any claim that the product is dangerous. **Benson v. Honda Motor Co.**, 26 Cal. App. 4th 1337 at 1344 (Cal. Ct. App. 1994); **Spino v. John S. Talley Ladder Co.**, 696 A.2d 1169 at 1173 (Pa. 1997). In this case, the evidence showed that there have been millions of minivans of this design manufactured and sold by DCC and the record does not contain evidence of a single accident tending to show that the Caravan was not crashworthy.

On the other hand, the plaintiffs proved that the FMVSS tests involved head-on collisions and crashes at a 30 degree angle to the barrier. At the time of the trial, the NHTSA did not have a standard for off-set crashes. As originally designed, the Caravan also failed the FMVSS 208 standards indicating that the driver would sustain forces in the chest area that exceeded the standard. The design changes ultimately adopted placed the crash initiators under the front seats so that the structure would collapse under the occupants. The forces generated during an accident would comply with the relevant standards, but at the cost of allowing the parts of the vehicle forward of the passenger compartment to be knocked backward into the passenger's space. In addition, the design allowed the floor under the seat to drop, tilting the back of the seat forward and allowing the steering wheel to shoot up through the roof. The air bag and seat belt protection system were, thus, compromised. The proof showed that the dash and other forward components had intruded into the passenger space by approximately 20 inches. The plaintiffs offered expert opinions that the Caravan was defective and unreasonably dangerous.

James Mundo, an automotive design engineer testified that customarily it takes sixty months from program approval to the time the first vehicle rolls off the assembly line. However, in this case of the minivan, Mr. Crossman testified that DCC shortened that time to approximately 32 months with a projected January 1995 launch date. Normally, the FMVSS tests are run approximately two years before launch of a vehicle. In the instant case, DCC was still performing these tests on the minivan two months before launch. In October 1994, DCC conducted a FMVSS 208 test and the minivan failed that test because of excessive G-Force on the dummy's chest. Mr. Crossman testified that DCC engineers made some structural modifications and re-ran the test in November 1994. In the November test, the minivan performed worse than it had in the October test. Mr. Mundo testified that a failing grade this close to production would have caused the DCC engineers to scramble in order to get the vehicle in compliance, to wit: [v 24 p. 946]

> This vehicle when they [DCC] were really ready for production, if you remember I testified earlier this morning that normally these kinds of tests will run 24 months before job one, and this thing was– tests were run before a couple months before job one.
> And when they first ran the tests they found that the numbers

they were getting back from the tests were such that they were going to fail the Federal 208 regulation....

And so the engineers then hurried up, and we have documents, and it definitely is indicative of, I've been there and that is the biggest nightmare in the world in the automotive industry, when you fail tests, production is around the corner, I mean, you don't go to bed. And you call your wife and family or your husband and say, Look, I'm not coming home....

Mr. Mundo testified that, after the October failure, DCC did what it should have done, which was to make design modifications to the front of the vehicle; however, when those changes yielded another failure in November, Mr. Mundo testified that DCC did the following: [v 24 p. 947]

I can't believe the decision they [DCC] took but what they decided to do is they deliberately then designed the structure to collapse under the occupant so that they could pass the test.

I have never–in 30 years in the industry, never heard of this, and I have never seen anybody do it, but goodness gracious, there it is. And as an engineer I'm shocked. I have never seen anything like that, but it passes the test.

Q. Mr. Mundo, are you suggesting that they intended for the vehicle to bend the way that it did?

A. Oh, absolutely. This vehicle–what you [] see here, the way that it performed, it performed exactly the way they designed it to perform. This isn't as though [the] thing bent and we said. Oh, my goodness, well, it's failing. It didn't fail. It performed exactly the way the engineers designed it to perform, and they did that [put crash initiators under the occupant compartment] to pass the test.

I'm here looking at this, and in 30 years of working and teaching and testing to keep the collapse of the occupant compartment out of the occupant compartment, to deliberately design it to make it collapse in the occupant–well, I'm just kind of speechless over that. It's very disturbing.

Although Mr. Mundo's testimony is rebutted by DCC's experts, we find that the evidence in the record provides sufficient material evidence on which the jury could have based its conclusion that the minivan was defectively designed and unreasonably dangerous. From the record, a reasonable jury could conclude that DCC deviated from engineering standards by placing crash initiators (*i.e.* pleated steel that is designed to compress during a crash in order to exhaust the energy and keep it away from the passengers) under the passenger space. Mr. Mundo testified that the

7

passenger space should be protected from intrusion by designing the vehicle to absorb the force of this type of collision in areas away from the passengers. Consequently, the presumption of fitness raised by the vehicle's passing FMVSS 208 is rebutted, and the trial court did not err in affirming the jury's finding of liability on the part of DCC for the injuries and death of Vickie Mohr.

## C.

The injuries to Ms. Heathscott were not caused by the same defects that caused Ms. Mohr's death. Concerning Ms. Heathscott's death, Plaintiffs asserted that the GEN-III seat belt used in the minivan malfunctioned–specifically, that it inadvertently released–thereby causing Ms. Heathscott grievous injuries. DCC contended that the GEN-III seat belt did not malfunction in this accident. Rather, DCC asserts that Ms. Heathscott was simply not wearing her seatbelt at the time of the accident. The evidence in record is disputed on this issue. Therefore, before discussing the alleged malfunction of the GEN-III seatbelt, we first address the question of whether Ms. Heathscott was, in fact, wearing the seatbelt at all. Dr. Michael Woodhouse testified that Ms. Heathscott died as a result of blunt trauma to her face and head and that these injuries are characteristic of those found in unrestrained passengers. Furthermore, he testified that there was no "loading" (i.e. marks to indicate that the seatbelt has been strained by doing its job in the course of an accident) on Ms. Heathscott's seatbelt. The post-mortem photograph of Ms. Heathscott in the vehicle does not show the seatbelt across her body; however, there is evidence in the record to suggest that the scene was compromised by rescue efforts. Yvette Atkins, a witness who arrived on the scene soon after the accident, testified that she saw the shoulder strap of the seatbelt across Ms. Heathscott's body. Both of the surviving passengers, Victoria Mohr and Carolyn Jones, also testified that Ms. Heathscott was wearing her seatbelt before the accident. Trooper Alan Earhart, who investigated the accident, testified that, when he first observed Ms. Heathscott in the vehicle, he saw the shoulder harness across her body. Based upon the jury's finding of liability in this case, it is apparent that they determined that Ms. Heathscott was wearing her seatbelt. Although the issue is disputed, there are sufficient facts in the record upon which the jury could have arrived at that conclusion.

The question then becomes whether the seatbelt inadvertently released at some point in the crash sequence. DCC contends that, because the Plaintiff's experts declined to give an opinion as to what caused Ms. Heathscott's belt to release, the finding of liability on the part of DCC concerning Ms. Heathscott's death should be reversed. We disagree. While expert testimony may be required to prove causation in "technically complex" cases, ***see, e.g., Fulton v. Pfizer Hospital Prods. Group, Inc.***, 872 S.W.2d 908 (Tenn. Ct. App. 1993), the issue of causation is ultimately one for the jury to determine, and "this Court has noted that a jury may infer a causal connection through the use of circumstantial evidence, expert testimony or both." ***Hamblen v. Davidson,*** 50 S.W.3d 433, 440 (Tenn. Ct. App. 2000).

Larry Sicher, a mechanical engineer with ARCCA, performed testing on the GEN-III seatbelts. The test used by Mr. Sicher was a 40 millimeter ball (or sphere) test. Both a 30 millimeter and 40 millimeter ball test have been used to test seatbelts since the 1980s. In the ball test, the tester

moves the ball across the release button on a latched seatbelt to determine the ease with which it disengages. The 40 millimeter test is an easier test to pass than the 30 millimeter test. Mr. Sicher testified that the GEN-III belt failed the 40 millimeter test on three attempts. Furthermore, Mr. Sicher testified that, for his testimony in this case, he purchased a new seatbelt for the front passenger of the Dodge Caravan and ran five 40 millimeter ball tests on this buckle. The buckle failed all five tests. Mr. Sicher testified that, other than the GEN-III seatbelt, none of the other belts tested failed. In conclusion, Mr. Sicher opined that Ms. Heathscott's seatbelt inadvertently released during the accident, to wit: [v 21 p. 723]

> Q. Inadvertent contact and release of this buckle, do you have an opinion that this buckle was inadvertently contacted and released?
>
> A. Based on the witness' testimony, that is the explanation that would explain [Ms. Heathscott] being unbelted during the primary crash sequence.

John Sparhawk, who worked as a product engineer for DCC, testified that, during his tenure at DCC, he observed inadvertent release of the GEN-III seatbelt during routine crash tests. Mr. Sparhawk testified that, when he brought his findings to the restraints executive engineer, "she asked [him] not to film any more of these events." Furthermore, Mr. Sparhawk stated that he was instructed to shred his written test summary. The evidence reveals that DCC stopped using the GEN-III seatbelts in its Durango and Dakota; however, DCC continued to use the GEN-III belt in the minivan platform.

From the evidence as a whole, we conclude that a reasonable jury could infer that Ms. Heathscott's seatbelt malfunctioned and inadvertently released during the crash sequence, thereby causing her grievous injuries. Consequently, the trial court did not err in affirming the jury's findings of liability on the part of DCC *vis-'a-vis* Ms. Heathscott.

## IV. COMPENSATORY DAMAGES

Turning to the compensatory damages award rendered in this case, DCC asserts that the $7.5 million awarded to Vickie Mohr's estate is not "within the range of reasonableness." We disagree. In *Thrailkill v. Patterson*, 879 S.W.2d 836 (Tenn. 1994), our Supreme Court recognized that, in certain cases, "it is the jury's special province to evaluate damages and that a life cannot be defined with 'mathematical precision'." *Id.* at 843. The *Thrailkill* Court further stated that:

> In *Wolfe v. Vaughn*, 177 Tenn. 678, 688, 152 S.W.2d 631, 635 (1941), this Court stated that the "amount fixed by the jury and concurred in by the trial judge will be accepted upon appeal unless there is something to show a violation of the discretion" of the trial judge. We have also said that a jury verdict that has the trial judge's

9

approval is entitled to "great weight," ***D.M. Rose & Co. V. Snyder***, 185 Tenn. 499, 525, 206 S.W.2d 897, 908 (1947), and that the appellate court "rarely ever" disapproves damages set in this manner. ***McClard v. Reid***, 190 Tenn. 337, 343, 229 S.W. 2d 505, 507 (1950). We again emphasized the responsibility of the trial judge in determining whether the amount fixed by a jury is excessive: After he has approved the verdict it is our duty not to disturb it unless it is evident that he failed to keep the jury within reasonable bounds.

***Thrailkill***, 879 S.W.2d at 840.

In a wrongful death case the plaintiff may recover two classes of damages: (1) compensation for the mental as well as the physical suffering of the decedent between the injury and death, and (2) the pecuniary value of the life of the decedent to be determined upon a consideration of his expectancy of life his age, condition of health and strength, capacity for labor and for earning money through skill in any act, trade, profession, and occupation or business. id. @ 841. The pecuniary value of a decedent's life now includes a value for the loss of consortium for a spouse or child. ***Hunter v. Ura***, 163 S.W.3d 686 (Tenn. 2005). As the court said in ***Hunter***.

> Loss of consortium consists of several elements, encompassing not only tangible services provided by a family member, but also intangible benefits each family member receives from the continued existence of other family members. Such benefits include attention, guidance care, protection, training, companionship, cooperation, affection, love, and in the case of a spouse, sexual relations.

These principles necessarily mean that "the assessment of damages is not governed by fixed rules of mathematical precision, but the matter is left to the sound discretion of the jury." ***Thrailkill v. Patterson***, 879 S.W.2d 836 at 841 (Tenn. 1994).

In this case the proof showed that Ms. Mohr would have earned between $500,000 and $1,000,000 over her remaining life, depending on whether she retired at age sixty-five or worked for the remainder of her life expectancy. In addition, Mr. Mohr had to quit his job in order to take care of Victoria, who was ten at the time of the accident.

The proof showed that the Mohr family were very close. Mr. Mohr was deprived of his wife's attention, companionship, cooperation, affection and love. In addition to all of those elements, Victoria lost her mother's guidance, care, protection and training.

Finally, Ms. Mohr was not killed instantly. She survived long enough for witnesses to arrive at the scene and observe her moaning as she lay trapped in the wreckage along with her dead mother, her injured child and sister.

We conclude that there is material evidence to support the jury's compensatory verdict for Ms. Mohr's wrongful death.

## V.  PUNITIVE DAMAGES

### A.
### Sufficiency of the Evidence

Following Phase II of the trial the jury returned a punitive damages award in favor of the estate of Vickie Mohr in the amount of $48,778,000.00.  On appeal, DCC asserts that the question of punitive damages should never have gone to the jury because there is no clear and convincing evidence in the record to support a finding that DCC acted intentionally and/or recklessly in its design of the minivan.

In ***Flax v. DaimlerChrysler Corp.***, ____ S.W.3d ___ 2008 W.L. 2831225 (Tenn. July 24, 2008) our Supreme Court reiterated the standards that now govern the ability of a Tennessee court to award punitive damages against a defendant.  The court said:

> A verdict imposing punitive damages must be supported by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly. _Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992)._  In *Hodges*, we held that evidence is clear and convincing when it leaves "no serious or substantial doubt about the correctness of the conclusions drawn." *Id*. at 901. We also held that a person acts recklessly when "the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Id.* at 901.
>
> ***
>
> When this Court is called upon to review the reasonableness of a jury's verdict, as we are in this case, we "are limited to determining whether there is material evidence to support the verdict." *Id*. At 898. In making this determination, we do not re-weigh the evidence. _Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.,_ 691 S.W.2d 522, 526 (Tenn. 1985). Rather, we are "required

11

to take the strongest legitimate view of all of the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary." *Id*. The jury's verdict must be affirmed if any material evidence supports it. *Id*. Therefore, our review of this issue is limited to determining whether any material evidence supports the jury's conclusion that there is no serious or substantial doubt that DCC consciously disregarded a known, substantial, and unjustifiable risk to the plaintiffs.

In Part III of this opinion, we have reviewed the evidence in the record in some detail on the question of whether the Caravan was defective and unreasonably dangerous. Our task in this section is to determine whether that evidence is clear and convincing enough under the Supreme Court's standards to allow a jury to conclude that DCC acted recklessly in marketing a vehicle that posed a risk of substantial harm to the plaintiffs.

The trial judge in performing his duties under **Hodges v. Toof** filed his findings of fact and conclusions of law after the jury's verdict. He found:

> The punitive damages award is consistent with the reprehensible nature of DCC's conduct as testified to at trial by Plaintiffs' expert witnesses, Jim Mundo, Allan Sparhawk and Paul Sheridan. Mr. Mundo testified at trial that DCC deliberately installed crush initiators, pleats which collapse like an accordian in the event of a crash, directly under the driver's seat in the NS-platform minivan. According to Mr. Mundo, no manufacturer has ever designed a vehicle in this way other than DCC, and the design flies in the face of 30 years of automotive engineering. Moreover, according to Plaintiff's expert witness Mr. Sheridan, DCC was aware that the NS-platform minivan had frontal offset impact safety issues as revealed by the EURO-NCAP test in which the NS-platform minivan received the lowest possible score of zero. In Mr. Sheridan's opinion, DCC failed to adequately remedy these safety concerns. Mr. Sheridan also testified that DCC chose to dissolve the Minivan Safety Leadership Team when the team reported its frustrations with the design of the NS-platform minivan to DCC.

> As further evidence of the reprehensible nature of DCC's conduct, Plaintiff's expert witness, John Sparhawk, testified at trial that DCC altered the testing protocol for the performance of the Federal Motor Safety Standard 208 (FMVSS 208) test. According to Mr. Sparhawk, these alterations included keeping the crash test

dummy off the seat until immediately before the test was started, putting a strap across the dummy to lift him up during the test, and adjusting the seat as far forward and as upright as possible to reduce the distance the dummy would travel prior to impact with the steering wheel.

The foregoing testimony adduced at trial is evidence of the objectionable and reprehensible nature of DCC's conduct in the manufacture and distribution of the NS-platform minivan and supports the jury's punitive damages award in the present case.

\*\*\*

Mr. Mundo testified that Defendant DCC brought the NS-platform minivan to production in approximately 32 months, which is nearly one-half of the industry standard of 60 months for a comparable vehicle. Mr. Mundo also testified that bringing a vehicle to production in that reduced amount of time would reduce the production costs for the particular vehicle by one-half. Furthermore, Mr. Sheridan testified at trial that DCC had the opportunity to correct the known defects in the NS-platform minivan in late 1994, but instead chose to move forward with production to get the minivan to market by target date. The evidence shows that DCC reaped substantial pecuniary benefits, in the form of profits, through its actions in moving the NS-platform minivan to market in the unusually short period of time, despite the problems with the vehicle. The substantial profits received by DCC alleviate the concern that the punitive damage award in this case is excessive and thereby supports the jury's award of $48,778,000 in punitive damages.

When the trial judge addressed the question again in ruling on DCC's motion for a new trial he said: "[t]he Court has reviewed the jury's punitive damage verdict and has made an independent review of all the evidence in this case in its role as thirteenth juror and finds that the evidence preponderates in favor of the jury's verdict both as to compensatory and punitive damages."

An argument could be made that in mentioning the preponderance of the evidence the trial judge overlooked the heightened standard of proof required to sustain a verdict of punitive damages. But we think that there can be no doubt that the trial judge understood his duty and, to him, the proof was clear and convincing that DCC had acted recklessly in marketing a defective and dangerous vehicle.

The difficulty in performing this part of our task lies in knowing when we have ceased

13

reviewing the evidence in the record and have entered into the forbidden territory of weighing the evidence. In *Flax*, a majority of the Supreme Court specifically pointed out that even under the heightened standard of proof required to support a verdict for punitive damages, we do not weigh the evidence; rather we are "required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict and to discard all to the contrary." _____ S.W.3d _____ at _____, 2008 WL 2831225 at *7. (Tenn. July 24, 2008). (Citing *Elec. Power Bd. Of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985)). Justice Wade in his concurring opinion cited *Crabtree Masonry Co. V. C & R Constr., Inc.*, 575 S.W.2d 4 (Tenn. 1978) to the same effect.

The evidence cited by the trial judge is largely undisputed. DCC seeks to blunt the effect of that proof by referring to other evidence that showed compliance with the federal crashworthy tests, that showed compliance with industry standards, and that showed DCC made a reasonable design choice when it placed the crush initiators under the passenger compartment.

All of these arguments were presented to and rejected by the jury. As we have pointed out, the jury could reasonably have concluded that the federal tests did not test the Caravan under the conditions involved in this accident; and that to comply with the federal tests, DCC deliberately allowed the components of the automobile forward of the passenger space to intrude on that space to a dangerous degree. In addition, the placement of the crush initiators under the driver's seat caused the seat to tilt forward and the steering wheel to shoot upward. The net effect was a loss of the airbag protection. As to the industry standards, the proof at trial showed that no other manufacturer has designed a vehicle in this way.

For this court to say that the jury should have been persuaded by this proof to find that DCC did not act recklessly would amount to a substitution of our judgment for that of the jury about the weight of the evidence. All of our precedents prevent us from doing that.

We find from a review of the record as a whole that there is clear and convincing proof from which the jury could have concluded that DCC acted recklessly in marketing a defective and unreasonably dangerous vehicle

**B.**
**The Amount of Punitive Damages**

DCC argues that the $48,778,000 punitive damage award violates its due process rights because it is grossly excessive.

Starting in the late 1980's, the United States Supreme Court issued a series of opinions addressing the propriety of punitive damage awards under our constitution. See *Browning-Ferris*

14

***Indus. Of Vt. V. Kelko Disposal, Inc.,*** 492 U.S. 257 (1989); ***Pac. Mut. Life Ins. Co. V. Haslip***, 499 U.S. 1 (1991); ***TXO Prod. Corp. V. Alliance Res. Corp.***, 509 U.S. 443 (1993); ***BMW v. Gore***, 517 U.S. 559 (1996); and ***State Farm v. Campbell***, 538 U.S. 408 (2003). The Court has been justifiably concerned about how leaving the question of punitive damages to the unfettered discretion of the jury complies with due process. Our Supreme Court's groundbreaking decision in ***Hodges v. Toof***, 833 S.W.2d 896 (Tenn. 1992) provided the guidelines for the Tennessee courts.

The U.S. Supreme Court's latest decisions have dealt with the tests to determine how much punitive damages may be awarded without violating the defendant's due process right to know what the consequences of his conduct might be. See ***BMW v. Gore***, 517 U.S. 559 (1996). In ***Flax***, our Supreme Court surveyed the cases:

> In *Gore* the United States Supreme Court was called upon to determine the constitutionality of a punitive damage award. The Court concluded that due process requires that "a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Gore, 517 U.S. at 574*. Accordingly, the Court adopted three guideposts for determining whether a defendant has adequate notice of the magnitude of the sanction that may be imposed. The first and most important guidepost is the reprehensibility of the defendant's conduct. *Id. at 575*. The Court indicated that the presence of violence, deceit, reckless disregard for the safety of others, or repeated misconduct may be aggravating factors that increase the reprehensibility of the defendant's conduct. *Id. At 575-76*. The second guidepost is the ratio between the punitive damage award and the actual harm suffered by the plaintiff. *Id. At 580*. Although the Court declined to adopt any strict mathematical formula, it repeated the suggestion from a previous case that "a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line' "of constitutional impropriety. *Id. At 581-82* (quoting *Pac. Mut. Life Ins. Co. V. Haslip*, 499 U.S. 1, 23-24 (1991)). The final guidepost requires courts to compare the punitive damage award to civil or criminal penalties that could be imposed for similar conduct. "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue.'" *Id. at 583* (quoting *Browning-Ferris Indus. Of Vt., Inc. V. Kelco Disposal, Inc.*, 492 U.S. 257, 301 (1989) (O'Connor, J., concurring in part and dissenting in part)). These legislative judgments are relevant because they provide defendants with notice

of the severity of the penalty that may be imposed upon them. *See id.* at 584.

The United States Supreme Court next considered the due process requirements for punitive damages in *Campbell*. The Court again observed that the reprehensibility of the defendant's conduct is the most important guidepost. <u>Campbell</u>, 538 U.S. at 419. In an effort to provide guidance to lower courts, the Court stated that courts should determine reprehensibility

> by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice; tricker, or deceit, or mere accident. *Id*.

> The Court further stated, "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id*. With regard to the second guidepost, the Court stated, "[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id*. At 425. In addition, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id*. The Court then qualified its previous statement by observing that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id*. Finally, when discussing the third guidepost, the Court held that
> [t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal

> sanction does not automatically sustain a punitive damages award. *Id*. At 428.
>
> Unlike the deferential standard of review employed when reviewing a jury's factual conclusions, we conduct a de novo review of the amount of a punitive damages award to determine whether the award meets due process requirements in light of the three guideposts. *Id*. at 418.
>
> S.W.3d _____, 2008 WL 2831225 at *18-20 (Tenn. July 24, 2008).

The Supreme Court in *Flax* did not discuss the prior Tennessee cases that made the wealth of the defendant a relevant factor. See *Keith v. Murfreesboro Livestock Market*, 780 S.W.2d 751 (Tenn. App. 1989); *Coppinger Color Lab, Inc. V. Nixon*, 698 S.W.2d 72 (Tenn. 1985). In *Hodges v. S.C. Toof & Co.*, the Court listed nine factors to be considered and the "defendant's financial affairs, financial condition and net worth" was the first on the list.

Nevertheless, as the Supreme Court said in *Flax*, our duty is to "conduct a de novo review of the amount of a punitive damages award to determine whether the award meets due process requirements in light of the three guideposts." *Flax* @ *20.

Reprehensibility: The able trial judge held that DCC's conduct in marketing a dangerous product was indeed reprehensible. We do not quibble about that finding. But the U.S. Supreme Court in *Gore* and our Supreme Court in *Flax* talk about degrees of reprehensibility or "increasing" the reprehensibility of the defendant's conduct.

In this case, we are not persuaded that DCC's conduct advances far into the reprehensibility spectrum. Although the harm caused was physical as opposed to economic, there is no proof that DCC knew of a test result or of another accident that suggested the Caravan would fail in the dramatic way it failed in this accident. As we have pointed out, there is no evidence of any other failure of the same kind, despite the millions of Caravans on the road. The trial judge agreed that at the time of the sale in this case, DCC was not aware of the amount of the harm being caused.

The Ratio Test: As the Court said in *Flax*, awards that exceed a single-digit ratio to compensatory damages are rarely justified and when the compensatory damages are substantial, a 1:1 ratio may reach the outer limit of due process. The Court in *Flax* approved a ratio of 1 to 5.35, while acknowledging that the United States Supreme Court had hinted in *Gore* that a ratio of 1 to 4 might "close to the line."

Comparable Penalties: The Court in *Flax* also discussed the United States Supreme Court's third guidepost of comparing the punitive damage award to civil or criminal penalties that could be imposed for similar conduct. After reviewing a criminal statute that imposed a $125,000 fine on a

17

corporation for a reckless homicide, the Court concluded that the difficulties in reconciling the third guidepost with the first two compelled a decision to give the first two considerably more weight.

In view of our conclusion that DCC's conduct in this case did not rise to a high level of reprehensibility and in view of the substantial award of $3,450,000 against DCC in compensatory damages, we conclude that an award of punitive damages of more than $13,800,000 (a ratio of 1 to 4) cannot be sustained. We therefore reduce the punitive damage award to $13,800,000.

## VI. THE BREACH OF WARRANTY ISSUE

DCC argues that it is entitled to a new trial on the punitive damage claim because the jury's verdict could have been based on a breach of warranty and Tennessee law does not allow the recovery of punitive damages for a breach of contract.

Int this case, the jury was presented with three independent theories of liability: (1) strict liability, (2) negligence, and (3) breach of the implied warranty of fitness and merchantability. The jury returned a verdict for the plaintiff with respect to each theory of liability and then answered yes to this question: Do you find that the plaintiffs proved by clear and convincing evidence that the Defendant's conduct was intentional or reckless?

DCC's position is that the finding of intentional and reckless conduct may have applied only to the breach of warranty claim. Therefore, we can't be sure that the punitive damage award was for the tort claims rather than the contract claim. See *Concrete Spaces, Inc. V. Sender*, 2 S.W.3d 901 (Tenn. 1999).

We find this argument to be unpersuasive for two reasons. First, the jury clearly awarded damages for the tort claims and the finding of intentional and reckless conduct appears to apply to all three theories of recovery. Verdicts should be construed in a manner that upholds the jury's findings, *Concrete Spaces*, at 911. Therefore, we conclude that the jury found intentional and reckless conduct on the part of DCC for all the theories of recovery.

In the second place, even if the intentional and reckless finding only applied to the breach of warranty claim, that finding would place this case in the class of cases where the courts have found an exception to the rule that no punitive damages may be awarded for breach of contract. In *Medley v. A.W. Chesterson Co.*, 912 S.W.2d 748 (Tenn. Ct. App. 1995) the Court said:

> [4] As to the issues relative to the directed verdict as to the punitive
> damages feature of the breach of contract claim, we first note that as
> a general rule punitive damages are not proper in breach of contract
> cases. *Bland v. Smith*, 197 Tenn. 683, 277 S.W.2d 377 (1955);
> *Johnson v. Woman's Hospital*, 527 S.W.2d 133 (Tenn.App.1975).

There are exceptions, however, in cases involving "fraud, malice, gross negligence or oppression." *Bryson v. Bramlett*, 204 Tenn. 347, 321 S.W.2d 555 (1958), quoting from *Louisville, N. & G.S.R. Co. V. Guinan*, 79 Tenn. 98 (1883).

*id*. At 752-753

We think the Court recognized that where a defendant breached a contract with conduct that would entitle the plaintiff to punitive damages, the punitive damage claim would not be defeated simply because the action was on the contract.

## VII. THE AD DAMNUM ISSUE

In this case, the Complaint sought compensatory and punitive damages for the estate of Vickie Mohr in the amount of $15 million. After the verdict on the first phase of the trial, the plaintiff sought, and the Court granted, permission to increase the ad damnum clause to $50 million. Part of the Court's reasoning was based on the fact that this was the aggregate amount initially sought for the injuries to all four occupants of the Caravan.

Without the amendment, the plaintiff would be limited to a recovery of $15 million. This Court has held that a jury may not award damages to a single plaintiff that exceeds the amount that plaintiff sued for even though the award is within the aggregate amount sought for all plaintiffs. *Hansen v. Bultman*, 2002 WL 31780680, *2-3 (Tenn. Ct. App. Dec. 13, 2002).

DCC argues that the Court lacked the authority to allow the amendment because Rule 15.02 Tenn. Rule Civ. Pro. prohibits post-verdict amendments increasing the amount sued for.

We are persuaded that allowing the amendment was within the discretion of the trial judge. *Merriman v. Smith*, 599 S.W.2d 548 (Tenn. Ct. App. 1979). The amendment was not allowed post-verdict. It came after the compensatory damage verdict but before the trial on the amount of punitive damages. Therefore, the motion to amend came at a time when the trial judge still had the power to allow the amendment.

A trial court's discretionary ruling on amendments to pleading will not be disturbed on appeal unless there is a showing of a clear abuse of discretion. *George v. Bldg. Materials Corp. Of Am.*, 44 S.W.3d 481 (Tenn. 2001). The most important factor to consider in ruling on a motion to amend is the potential prejudicial effect on the opposing party. *Blocker v. Dearborn & Ewing*, 851 S.W.2d 825 (Tenn. Ct. App. 1992). The trial judge gave DCC a hearing on the motion to amend to show how it would be prejudiced by the amendment. After hearing the objections the trial judge granted the motion to amend.

On appeal, DCC does not argue that the trial judge abused his discretion in granting the motion. Rather, DCC argues that he did not have the authority or that he violated the prohibition against aggregating claims announced in **_Hansen v. Bultman_**, supra. We do not interpret the Court's order that way. The trial judge's limit of $50 million on the amendment addressed DCC's concerns about notice to insurance carriers and retention amounts, but the Court was not aggregating the amounts sued for by all plaintiffs - post verdict - to justify the amendment.

We find this issue to be without merit.

## VIII. <u>OTHER GROUNDS FOR NEW TRIAL</u>

DCC alleges numerous evidentiary and other errors. We will address each of these in turn.

### A.
### <u>Paul Sheridan Testimony</u>

DCC first asserts that the trial court erred in allowing Paul Sheridan to testify as an expert witness on general automobile safety. Specifically, DCC contends that Mr. Sheridan's testimony was improper because "he is not an engineer; has never worked as an engineer; has never designed a component part for a production vehicle; has never designed a complete crashworthiness system; has never been asked to conduct a crash test; and has never written a crash test report." DCC filed a Motion in Limine to exclude Mr. Sheridan's testimony at trial, which motion was denied. The trial court allowed Mr. Sheridan to testify as "an expert in the area of general automobile safety."

In order to be admissible, expert testimony must be relevant and it must satisfy Tennessee Rules of Evidence 702 and 703. Rule 702 states that, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

20

Therefore, the trial court must determine that (1) the witness qualifies as an expert, and (2) the expert's testimony is reliable in that the facts underlying the testimony are trustworthy and the testimony will substantially assist the trier of fact. **Brown v. Crown Equip. Corp.**, 181 S.W.3d 268, 274 (Tenn. 2005). "The objective of the trial court's gatekeeping function is to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" **Id.** At 275 (quoting **Kumho Tire Co. V. Carmichael**, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). The trial court's gate-keeping function is reviewed under an abuse of discretion standard. **Id.** at 273.

According to his testimony, Mr. Sheridan holds a M.B.A. from Cornell University, with a concentration in logistics and general management, which according to Mr. Sheridan, is "the business management or tool for maintaining efficient operation, overall operations of an organization, both the inputs and the outputs, to providing products to market. So the logistic's position is to maintain efficiency." Mr. Sheridan worked in car product development and power train systems planning for Ford Motor Company from 1980 until 1984. In 1984, Mr. Sheridan was hired by DCC. One of Mr. Sheridan's jobs with DCC was to assist in the reorganization of DCC's engineering into business groups. To this end, he was required to become very familiar with the engineering design and development process. In 1991, Mr. Sheridan moved to minivan operations at DCC, where he was appointed to chair the minivan complexity team. In this capacity, Mr. Sheridan's role was "to make product development and deliver it to the market efficient[ly]...my job would have been to make the production of the vehicle efficient and easy to do." At the end of 1992, Mr. Sheridan was appointed chairman of the Minivan Safety Leadership Team ("MSLT"). The MSLT team was in charge of monitoring safety innovations and competitive activity. In addition, Mr. Sheridan was also a member of the minivan Product Direction Team. From our review of Mr. Sheridan's qualifications and job history, we conclude that the trial court did not err in qualifying him as a general expert in general automobile safety from a business and logistical standpoint. From our review of Mr. Sheridan's testimony, it appears that he did not testify outside the scope of his expertise. Mr. Sheridan focuses on business development concerning safety standards that DCC asked the MSLT to explore, particularly off-set testing. Mr. Sheridan did not testify as an engineering expert as DCC asserts. Rather, he testified about the safety recommendations made to DCC by the MSLT and the fact that DCC did not implement these recommendations in its minivan platform. Mr. Sheridan's opinion that DCC rushed to get the minivan into production without making it sufficiently safe in off-set crashes is within the scope of his expertise as a general safety and logistics expert. Consequently, we conclude that the trial court did not abuse its discretion in allowing Mr. Sheridan's testimony.

### B.
### Evidence Concerning Dissimilar Vehicles

DCC asserts that the trial court erred in allowing Plaintiffs to rebut the T.C.A. § 29-28-104 presumption with "graphic evidence of injuries caused by *other* manufacturers' *dissimilar* vehicles."

21

Presumably, DCC is referring to Plaintiffs' cross-examination of its expert, General Jerry Curry. As former head of the NHTSA, General Curry testified on direct that compliance with FMVSS 208 proved the minivan's safety to consumers. In order to rebut the T.C.A. § 29-28-104 presumption, on cross-examination, Plaintiffs asked General Curry whether every vehicle that comes off the assembly line (presuming said vehicle passed FMVSS 208 or other government safety tests) was safe. General Curry answered "Yes." Thereafter, Plaintiffs asked General Curry about certain vehicles (e.g. the Ford Pinto) that had come off the line and then later proved to be dangerous.

The scope of cross-examination rests largely in the sound discretion of the trial judge. *Wagner v. Niven*, 332 S.W.2d 511 (Tenn. Ct. App. 1959). The presumption raised by T.C.A. § 29-28-104 is rebuttable and, in order to succeed in its case, Plaintiffs must rebut that presumption. Here, Plaintiffs chose to rebut the presumption by eliciting testimony that not all vehicles that pass federal standards are ultimately proven crashworthy. We find that the line of questioning used by Plaintiffs did not rise to the level of reversible error and was, in fact, well within the scope of cross-examination.

## C.
## Accusations of Misconduct

DCC next contends that it was prejudiced by "utterly unsupported accusations of misconduct that were calculated to...induc[e] the jury to decide the case based on innuendo and passion." DCC first points to a portion of Plaintiffs' opening statement: "They [DCC] jimmy-rigged the test [FMVSS 208]. I'm going to say it again. It's hard words. They fixed the test." We find no error in this argument. Plaintiffs' position during the course of these proceedings has been that, although DCC passed FMVSS 208, it did so by designing the vehicle in contravention of engineering standards. At trial, Plaintiffs' expert James Mundo testified that DCC went against engineering standards by placing crash initiators under the occupant space as opposed to in the front of the vehicle. In short, Plaintiffs' case is not about the minivan's failing FMVSS 208 (because ultimately it did not). Rather, it is about Plaintiffs' assertion that, in order to pass this required test and move the minivan into production on schedule, DCC sacrificed the engineering integrity of the vehicle. Consequently, we cannot conclude that the trial court erred in allowing this argument.

DCC also asserts that, during closing argument, Plaintiffs' counsel "urged the jury to speculate that DCC had shredded dozens of customer complaints involving the Gen-3 seatbelt buckle in order to keep this information away from the jury." DCC cites Plaintiffs' counsel's comment; "I submit to you these are the ones [documents] they [DCC] gave us.... I don't know how many hit the shredder and hit the destroyer." Counsel withdrew the last sentence of the statement following a bench conference.

Under Tenn. R. App. Proc. 36(b) a final judgment will not be set aside unless, considering the record as a whole error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process. The trial judge instructed the jury that

statements made by the attorneys were not evidence. In addition, the trial judge overruled DCC's motion for a new trial on this issue. The trial judge is in the best position to determine whether or not the comments affected the verdict. We are not able to conclude that the trial judge committed reversible error in overruling the motion for a new trial on this issue.

**D.**
**Post-Sale OSIs**

DCC asserts that the trial court erred "by permitting Plaintiffs to introduce evidence of OSIs concerning the Gen-3 seatbelt that occurred months or years *after* the sale of the Caravan in this case (which occurred in March 2000). Tennessee does not recognize a manufacturer's post-sale duty to warn. *Flax v. DaimlerChrysler Corp, et al.*, No. M2005-01768-COA-R3CV, 2006 WL 3813655 (Tenn. Ct. App. Dec. 27, 2006), *petition for cert. granted* May 14, 2007. However, OSIs may be admissible for purposes other than the non-existent duty to warn. *Id*. At *18. In Tennessee, "'evidence of other accidents is admissible at trial for two purposes: (1) to show the existence of a particular dangerous condition or (2) to show the defendant's knowledge of the dangerous condition.'" *Id.* (quoting *Stroming v. Houston's Restaurant, Inc.*, No. A1A-01-9304-CV-00189, 1994 WL 658542, at *2 (Tenn. Ct. App. Nov. 23, 1994). In general, admission of evidence is entrusted to the sound discretion of the trial court, and its rulings will be disturbed on appeal only upon a clear showing of an abuse of discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

Here, Plaintiffs offer several reasons as to why the OSIs were admissible. Specifically, Plaintiffs assert that the OSIs were offered to refute DCC's opening statement claim that the GEN-III seatbelt was created in response to customer complaints about the GEN-II belt, and to show the existence of a defect in the GEN-III design. Either of these reasons would provide proper justification for the inclusion of the OSIs. However, even if we assume, *arguendo*, that the post-sale OSIs were improperly admitted, we nonetheless conclude that such error was harmless. The record contains evidence, outside the OSIs, establishing that DCC had notice of the problems with the GEN-III seatbelt (*i.e.* eight pre-sale OSIs and the testimony of Larry Sicher, and John Sparhawk).

**E.**
**Witness Credibility**

DCC also asserts that Plaintiffs' counsel's comments, during closing argument, concerning the credibility of certain witnesses rises to the level of reversible error. Specifically, DCC contends that Plaintiffs' attorney "implored the jury to 'look [him] in the eye' and accept his belief that Carolyn Jones was a credible witness." Concerning Mrs. Jones, Plaintiffs' counsel stated:

> Carolyn Jones [has] as much integrity as any human being. And I
> represent corporations, I represent human beings. She's got as
> much integrity–and I'll look you in the eye and tell you this–as any

23

> human being I've ever represented....I don't believe Chrysler's got
> enough money to make Carolyn Jones tell a story on the witness
> stand under oath before God. I don't believe it.

We first note that DCC did not raise an objection after any of the above statements. However, even if we assume, *arguendo*, that the objection was preserved for appeal, we nonetheless conclude that this line of argument did not prejudice DCC's case. In general, control over the argument of counsel resides with the trial court, and the trial court has broad discretion as to what shall and shall not be permitted in argument. *McCollum v. Huffstutter*, No. M2002-00051-COA-R3-CV, 2002 WL 31247077, at *9 (Tenn. Ct. App. Oct. 8, 2002). The appellate courts generally will not interfere with the discretionary action of a trial court in refusing to grant a mistrial or a new trial for misconduct of counsel in argument unless the argument is clearly unwarranted and made purely for the purpose of appealing to passion, prejudices and sentiment which cannot be removed by sustaining the objection of opposing counsel, *see Perkins v. Sadler*, 826 S.W.2d 439, 442 (Tenn. Ct. App. 1991), or unless the appellate court finds affirmatively that the arguments or statements affected the result of the trial. *See, e.g., Pullman Co. V. Pennock*, 118 Tenn. 565, 102 S.W. 73 (1907). Although we concede that Plaintiffs' counsel should not have vouched for the credibility of its witnesses, the jury was instructed that findings of credibility of witnesses are left to the jury, and that arguments made by counsel are not proof. From the totality of the circumstance, we conclude that these isolated comments do not rise to the level of reversible error.

## IX. CONCLUSION

We affirm the jury's findings of liability for compensatory and punitive damages. We, however, remit the amount of punitive damages to $13,800,000 and remand the cause to the Circuit Court of Shelby County for the enforcement of the judgment and for any further proceedings that may become necessary. Tax the cost on appeal to DaimlerChrysler Corporation.

_____
Ben H. Cantrell, Sp. J.

24