William MEDLEY, Plaintiff–Appellant,

v.

A.W. CHESTERTON COMPANY, Defendant–Appellee.

Court of Appeals of Tennessee, Eastern Section.

Aug. 31, 1995.

Application for Permission to Appeal Denied by Supreme Court Dec. 18, 1995.

 

David A. Burkhalter, II, Knoxville, for appellant.

James T. Shea, IV, Knoxville, for appellee.

## OPINION

GODDARD, Presiding Judge (Eastern Section).

This is a suit by William Medley against his former employer, A.W. Chesterton Company. As stated in his brief, he seeks damages for "breach of contract involving a severance agreement, outrageous conduct, workers compensation retaliation, and punitive damages."

Chesterton interposed as a defense that the Federal Employee Retirement Income Security Act, 29 U.S.C.A. § 1001, et seq., commonly known as ERISA, pre-empted Mr. Medley's causes of action. The Trial Court bifurcated the hearing as to the ERISA defense and, after an evidentiary hearing, found that the Federal Act was inapplicable in that Chesterton's Severance Plan was not an Employee Welfare Benefit Plan, as contemplated by the Federal Act and, consequently, disallowed this defense. He did, however, grant a summary judgment as to the retaliation feature of the suit.

Thereafter, at trial, upon Mr. Medley resting his case, the Trial Court granted a directed verdict to Chesterton on the claims of outrageous conduct and punitive damages, leaving only the breach of contract theory to be submitted to the jury. Chesterton declined to introduce any proof and rested its case. Whereupon, the Trial Court granted a directed verdict in favor of Mr. Medley as to the remaining theory—breach of contract—in the amount stipulated by the parties of $9122.50 ($7004.52 damages; $2117.98 interest).

Both parties appeal. Mr. Medley insists that the Trial Court was in error in granting summary judgment as to his workers compensation retaliation claim and directing a verdict as to his claim of outrageous conduct and punitive damages.

Chesterton contends that the Trial Court was in error in not sustaining its pre-emption defense.

In the Spring of 1992, Chesterton contemplated selling portions of its business and anticipated laying off a substantial number of employees. Because of this, it, at the time of his lay-off, offered Mr. Medley certain severance benefits. A severance agreement signed by Mr. Medley provided that he would be terminated as of December 31, 1992, but would be entitled to receive his salary and other benefits incident to his employment until April 2, 1993, or until he received other gainful employment or applied for unemployment compensation. This agreement was conditioned upon Mr. Medley signing a release, which he executed on January 5, 1993, and returned to Chesterton. Thereafter, he received a check under the agreement for the month of January.

Mr. Medley was involved in an automobile accident on December 28, 1992, while still in Chesterton's employ, and thereafter requested worker's compensation benefits. Chesterton took the position that worker's compensation benefits were equivalent to unemployment benefits and suspended payments under the severance agreement until Mr. Medley rescinded his request for worker's compensation. Later, on February 18, Mr. Medley complied with Chesterton's request, rescinding his worker's compensation request and asking Chesterton to honor the severance agreement. Chesterton refused, unless Mr. Medley would agree that he was not employed by Chesterton when he was injured on December 28. Upon Mr. Medley's refusal to accede to this request, all benefits under the severance agreement were suspended.

■ We shall first address the issue raised by Chesterton Company. It is clear that a severance plan must meet certain criteria before it can be deemed an "Employee Welfare Benefit Plan" and subject to the provisions of ERISA, which, under 29 U.S.C. § 1144(a) contains the following expansive pre-emption clause:

### (a) supersedure; effective date

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

29 U.S.C. § 1002(1) defines an employee welfare benefit plan as follows:

For purposes of this subchapter:

(1) The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

The Eleventh Circuit, in *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (1982), elucidates on the Statute as follows:

In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits. Some essentials of a plan, fund, or program can be adopted, explicitly or implicitly, from sources outside the plan, fund, or program—e.g., an insurance company's procedure for processing claims, *cf.* 29 C.F.R. § 2520.102–5 (qualified health maintenance organization)—but no single act in itself necessarily constitutes the establishment of the plan, fund, or program. For example, the purchase of insurance does not conclusively establish a plan, fund, or program, but the purchase is evidence of the establishment of a plan, fund,

or program; the purchase of a group policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established.

In summary, a "plan, fund, or program" under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits. To be an *employee* welfare benefit plan, the intended benefits must be health, accident, death, disability, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services of severance benefits; the intended beneficiaries must include union members, employees, former employees or their beneficiaries; and an employer or employee organization, or both, and not individual employees or entrepreneurial businesses, must establish or maintain the plan, fund, or program.

As already noted, the Trial Court concluded that the plan contended to meet the requirements of the Federal Statute does not do so and that Chesterton is not protected by the preemptive features of § 1144(a).

Chesterton's brief lists five separate findings of fact upon which the Court based its ruling as follows:

1. That there existed no documents to show that there was a "plan".

2. That Chesterton did not intend to establish an ERISA plan.

3. That no separate fund or account had been established by Chesterton for the specific purpose of paying severance benefits.

4. That some of the form letters sent to plan beneficiaries contained negotiated terms in addition to the severance plan benefits.

5. That Chesterton had not provided its employees with a summary plan description setting forth the terms of the severance plan.

The brief then attempts to show that under federal case law the facts found by the Court do not justify its conclusion relative to the existence of an ERISA plan. While we concede that as to certain of the Trial Court's findings, Chesterton's argument has merit, we believe as to finding number five, relative to failure of any documents to disclose such a plan, the posture of the Federal case is significant. In *Brown v. Ampco–Pittsburgh Corp.*, 876 F.2d 546 (6th Cir.1989), the employees were insisting that they were entitled to the benefits of ERISA, and the employer was attempting to evade ERISA's responsibilities. This, we believe, prompted the appellate courts to hold that the fact a plan was confidential did not preclude the employees from insisting that it was an ERISA plan.

In addition to the foregoing facts relied upon by the Trial Court, Mr. Medley's brief accurately sets out a number of other facts which are not supportive of an ERISA plan:

Chesterton did not:

1.) produce a Plan Summary,

2.) produce a single document even referring to the agreement as an "ERISA" Plan,

3.) show compliance with any of the administrative requirements of ERISA such as to disseminate a "Plan Summary" as required by 29 U.S.C. § 1021, 1022 or file a "Plan Summary" as required by 29 U.S.C. §§ 1022, 1024,

4.) produce any tax filing documents for the severance agreement as required by § 26 U.S.C. §§ 6057, 6058,

5.) show compliance with any of the following statutes: 29 U.S.C. § 1023 (annual reports); § 1027 (retention of records).

Chesterton points out that certain of the filings were not due until July 29, 1993, long after Mr. Medley was terminated. However, it conceded below that even as of April 6, 1994, the date of the ERISA hearing, "there have been no filings yet with the Department of Labor specifically addressing the severance plans."

Before leaving this point we note, and this is not refuted by Chesterton, that benefits under the plan alleged to meet ERISA requirements were conditioned upon Mr. Medley signing a general release. In commenting on this aspect of the question, the Trial

Court stated the following with which we concur:

> The Court finds in this case that what the defendant contends is an ERISA severance benefit plan is not, in fact, an ERISA plan is not covered by ERISA. The Court notes that the one and only document purported to show that there was, quote, "a plan," close quote, established is Exhibit 1. It does not even deal with what the defendant takes issue at.
>
> The defendant takes the position in this case that one, it is a general release that this employee had to sign as part of this plan. It is nowhere mentioned in Exhibit 1 nor in any other document provided the Court requiring the employee to sign a general release in order to share in the benefit. That is contrary to the theory of ERISA. If it's an employee benefit plan under ERISA, the employee is not required to do anything other than request and receive his rights and fill out such forms if necessary to get the rights that that employee would have under that plan.
>
> The Court notes in paragraph of Exhibit 1 the very last paragraph on the page is, quote, "all written separation agreements must be agreed and approved by," indicating that this is not an intent to establish and there was never established a plan for severance benefits under ERISA. If that's so, no separation agreements would be necessary. It would be an administrable form that would have to be administered as referred to as the second element of ERISA.

In view of the foregoing, we conclude the evidence does not preponderate against the Trial Court's finding relative to the ERISA defense.

■ We begin our discussion of the summary judgment feature of this appeal by observing that this State has traditionally been what is known as a right-to-work state, which enables an employer, absent a contractual agreement to the contrary, to terminate an at-will employee "for good cause, bad cause or no cause at all." *Clanton v. Cain–Sloan Co.*, 677 S.W.2d 441 (Tenn.1984).

■ The first articulated departure from the foregoing rule is found in the case of *Clanton.* In that case the Supreme Court recognized that our worker's compensation statute prohibited the discharge of an at-will employee as retaliation for filing a worker's compensation claim.

Subsequent to *Clanton,* the Legislature enacted T.C.A. 50–1–304, which prohibits discharge under certain circumstances.

> **50–1–304. Discharge for refusal to participate in or remain silent about illegal activities, or for legal use of agricultural product—Damages—Frivolous lawsuits.**—(a) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.
>
> (b) As used in this section, "illegal activities" means activities which are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare.
>
> (c) Any employee terminated in violation of subsection (a) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

The fallacy of Mr. Medley's argument regarding his alleged retaliatory discharge because he asserted a worker's compensation claim, is that he was discharged before he filed his claim and any retaliation was the withholding of severance benefits to which he otherwise would have been—and ultimately was found to have been—entitled. Thus, if we agree with his contention we would be required to expand the present judicial and legislative pronouncements on the subject to include withholding of severance benefits because of a threatened worker's compensation claim. This we are disinclined to do given our historic adherence to the employee-at-will and right-to-work doctrines which are ingrained in Tennessee jurisprudence. We conclude if such an exception is to be made, it should be by either the Legislature or the Supreme Court.

■ As to the issues relative to the directed verdict as to the punitive damages feature

of the breach of contract claim, we first note that as a general rule punitive damages are not proper in breach of contract cases. *Bland v. Smith,* 197 Tenn. 683, 277 S.W.2d 377 (1955); *Johnson v. Woman's Hospital,* 527 S.W.2d 133 (Tenn.App.1975). There are exceptions, however, in cases involving "fraud, malice, gross negligence or oppression." *Bryson v. Bramlett,* 204 Tenn. 347, 321 S.W.2d 555 (1958), quoting from *Louisville, N. & G.S.R. Co. v. Guinan,* 79 Tenn. 98 (1883).

■ In the case at bar, taking the proof in the light most favorable to Mr. Medley, the proof shows that the reason his benefits were denied was because of Chesterton's belief that his asserting a claim for worker's compensation was equivalent to asserting one for unemployment compensation, which, under the agreement he had signed, justified termination of his benefits. We do not find that Chesterton's position under the proof in the record reaches the level of misconduct authorizing an award of punitive damages incident to the breach of contract claim.

■ With regard to the directed verdict insofar as it relates to the outrageous conduct claim, we first note that this cause of action was first recognized in the case of *Medlin v. Allied Investment Co.,* 217 Tenn. 469, 398 S.W.2d 270 (1966). In that case the Court, in enunciating the doctrine but not applying it to the facts of that case, adopted § 46 of the Restatement of Torts (2d) (217 Tenn. at 478; 398 S.W.2d at 274):

> These factors are set out in the Restatement of Torts (2d), § 46, "Outrageous Conduct Causing Severe Emotional Distress".
>
> "(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it, for such bodily harm."

Clarification of this statement is found in the following comment:

> "d. *Extreme and Outrageous Conduct.* The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defen-

dant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct is characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly untolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.' "

In the case at bar Mr. Medley's brief accurately sets out the proof relative to this cause of action upon taking it in the light most favorable to him:

1.) Defendant's agents and employees had knowledge that Plaintiff's long-term employment relationship with the Defendant had been summarily terminated thereby causing him to have emotional distress associated with the loss of his job, loss of his income, the potential loss of his health insurance and other benefits, and that he had not yet been offered a job by Defendant's successor.

2.) Defendant's agents and employees had knowledge that Plaintiff's emotional state was further exacerbated by the fact that his son had leukemia (which was currently in remission) and that his wife had a serious medical condition known as Crohn's Disease and maintaining health insurance was critical.

3.) Defendant's agents and employees knew Plaintiff was in severe financial distress, that his bills were due, and that the February salary continuation check, which was overdue, had not been sent to him.

4.) Defendant's agents and employees also had knowledge that the Plaintiff was involved in a serious automobile wreck on December 28, 1992, and as a result thereof was in great physical pain, and as a result of the injuries, he had been hospitalized several times, he was unable to work, he

was unable to drive and he was unable to even seek employment.

With full knowledge of the aforesaid, after the Defendant became aware of Plaintiff's request for workers' compensation, extended sick leave and long term disability benefits, the Defendant's actions included the following:

1.) Attempting to alter the severance agreement in order to "document" that his "last day worked" was December 7, 1992 when it knew he worked until December 31, 1992, and in fact, it paid him his regular salary and his regular car allowance for such time period, and reimbursed him for his expenses. This was apparently done in an attempt to defeat his workers' compensation claim as well as to defeat other potential claims for, such as extended sick leave and long term disability.

2.) Summarily suspending his salary continuation in February of 1993, as a result of his request for workers' compensation until such time as he "rescinded" his request for workers' compensation when such action clearly and unequivocally violated the provisions of the severance agreement and was a clear and unequivocal violation of Tenn.Code Ann. § 50-6-114.

3.) After the Plaintiff attempted to "rescind" the claim for workers' compensation benefits, the Defendant refused to reinstate the salary continuation unless Plaintiff would also write he was not working on December 28, 1992 when he clearly was working on that date, and even if Plaintiff did this, it was questionable as to whether his salary continuation would be forthcoming and in fact, the salary continuation was terminated retroactively to 1/31/92.

4.) Screaming at Plaintiff after he followed the employer's instructions and "rescinded" his workers' compensation claim, using harsh, foul, profane and abusive language (they talked to him "like a dog"), and threatened him.

5.) Informing Plaintiff after he "rescinded" his workers' compensation claim that it would not give him a good reference when they knew he was in the process of trying

to get on with the company that had purchased Defendant's rights in Tennessee.

6.) Terminating Plaintiff's salary continuation payments retroactively to 1/31/93 taking the position that there was a policy prohibiting "double payments" even though Plaintiff never received any workers' compensation and even though such "policy" was not in writing.

7.) Terminating Plaintiff's salary continuation payments retroactively to 1/31/93 taking the position that his request for workers' compensation was the same as applying for unemployment compensation when clearly it was not the case and even though Plaintiff never applied for unemployment compensation.

8.) Accusing Plaintiff of lying or not remembering about the severance agreement, and/or lying or not remembering about his "last day of work," and insisting to him that his "last day of work" was 12/7/92 and they had "statements" verifying this, when Defendant's agents and employees knew he had in fact worked the whole month of December and had been paid for the full month as a regular employee with his regular deductions, had received his regular car allowance, and had been reimbursed for his expenses.

9.) Informing Plaintiff, knowing he was disabled from working as a result of injuries sustained in the wreck of 12/28/92, that he wouldn't even be eligible for sick pay or disability even though a deduction had been taken out of his check for disability insurance for the full month of December because his "last day of work" was 12/7/92 when they knew he worked for the full month of December 1992.

10.) Even though Human Resources Director had full authority to change the date of Plaintiff's termination to 12/31/92, Defendant's agents lied that it was for a limited purpose only and that his "last day of work" was 12/7/92 and falsely stated she had exceeded her authority and that Plaintiff was now trying "to cut her throat ... by applying for workers compensation." (Emphasis in Mr. Medley's brief.)

We conclude that reasonable minds might differ as to whether the acts of Chesterton

were sufficiently egregious to sustain such a cause of action and that the Trial Court was in error in directing a verdict on this count.

In reaching our conclusion, we are not unmindful of Chesterton's argument that the only medical evidence presented relative to Mr. Medley's "serious mental injury" related to the termination of his severance benefits. Dr. Greenwood, the only expert to testify on Mr. Medley's behalf, gave the following evidence:

MR. BURKHALTER [reading deposition of Dr. Greenwood]: Question: Can you state whether or not in your opinion to a reasonable medical certainty Mr. Medley sustained a mental injury as a result of the discontinuation of his salary severance pay?

Answer: Yes, I think he did.

MR. SHEA: We withdraw that objection.

MR. BURKHALTER: Answer: I think we answered that in the first question. It would be the same answer as I understood this question. Maybe I missed something here. It's like yes, he did have serious depression as a result of a series of blows. The crowning blow was the discontinuation of his severance package when he had filed for workman's comp after the back injury.

. . . .

Question: Doctor, in terms of Mr. Shea asking you about causes of depression and in connection with the history that was given to you by Mr. Medley, how significant or how would you rate—

Answer: All these?

Question: —the stressor in terms of the discontinuance of severance, or can you rate them?

Answer: I can a little bit. Let me take a look at that for you. I go back to what I said earlier. I took a look at Mr. Medley from a biopsychosocial standpoint. Psychologically from the history I could get from the man, he's a man who—he had stable employment for a number of years. He's been married for a number of years. He and his wife have been able to survive serious medical challenge to their health, to the survival of one of their children and

with his wife's bowel disease and her surgery. And he's the kind of fellow, you take a look at him and you say, okay, life has thrown you some curves and you've not sought out psychiatric care before. You've handled those kinds of big stresses in your life. So you look at him psychologically and you think this man is basically fit. He's been through a lot, but he's come through a lot. So you think of him at a psychological level as someone with fairly strong emotional stability to start with. Okay.

Then you take a look at, well, what's going on with him biologically? You know, does he have a recurrent affective disorder? Does he have bipolar history? Does he have some other mental problem that's been concurrent and this is just one more stressor thrown on top of that? But really, no previous psychiatric history. So you don't get a real strong biologic component. What you do get from his history is that he's a man who has literally had the rug pulled out from under him in just the last few months. Part of it certainly is losing his job. That's a very significant blow to him. But, he's also a fellow who's bright enough and stable enough to look at, okay, what do I do with this. What do I need to do. And he's given a package of severance benefits and things that he can count on. He is stressed, but he's looking at I can continue health insurance, COBRA for awhile. I can make some house payments. Even though I've sunk a lot of our savings into the new house, I wish I had maybe not done this in retrospect, but I didn't know this was going to happen and now we're short a little bit on savings, but I think we can scrape by. My wife is working. I think we'll make it for awhile and I'll get myself back into shape.

Then he gets injured in this vehicular accident and he's really now not in a shape to pursue following up on another job. He's got—he walks around with pain in his back. He's a little bit incapacitated with it just to watch him walk around. And so he's saying how do you go in and apply for a job when you're looking like this. And that had him down and worried and concerned. So he files for workman's comp

anticipating I'll get some benefit there until I can get this back problem sorted out, and then I'll get on with my life. And then as soon as he does that, what he told me was that the company said, no, we cut you off completely. Then they made some sort of offer to him, okay, if you'll sign some sort of release and go back to work—or not go back to work or sign some sort of release—it wasn't workman's comp—we'll reinstate your severance. So he didn't really think that was right, but I think he was frightened and kind of scrambled and he wrote them a letter—or he told me he did—and said I need to get my severance package back. So okay, forget it, I won't call this workman's comp. And I think his response from that was forget it, we're not going to cover anything. You're out in the cold. And he was really left—that was such a blow to him to pull all that out from him because he's left with back problems, you know, all this other stuff. And then—and then what he had kind of looked at, okay, I can pull my life back together, I've got to do these steps and then, bam, one more time he gets hit. And that's it. You know, there is the straw that breaks the camel's back.

So when you rank these in priority, it's like, well, you can't say any one thing is the sole cause because it's not. He had a whole lot on him already. But this was just a big blow, the severance cutoff. And I think that is when he finally was beyond the point of coping and being able to handle it for himself. And that's when he sought out help from professionals. That's when he began to become catastrophic in his thinking. He began to think all was lost, he wasn't going to make it, I might as well die. And that's when he said, okay, maybe not die, but get some help here. And he was earnestly coming in asking for help, you know, and that's where we started from.

While it is true that the doctor felt the "crowning blow" resulting in Mr. Medley's mental injury was the termination of severance benefits, we believe the doctor's testimony viewed in a light most favorable to Mr. Medley is sufficient to also relate the other acts of Chesterton to his mental injury.

For the foregoing reasons the judgment of the Trial Court is affirmed in part, vacated in part, and the cause remanded for proceedings not inconsistent with this opinion. Costs of appeal are adjudged one-half against Mr. Medley and his surety and one-half against Chesterton Company.

McMURRAY, J., and CLIFFORD E. SANDERS, Senior Judge, concur.