NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0531n.06

Nos. 15-5541/5577

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Sep 13, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DAN BENNETT and KAREN BENNETT, | ) | |
| | ) | |
| Plaintiffs-Appellants/Cross-Appellees, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CMH HOMES, INC., dba Luv Nashville, | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellee/Cross-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:    SUHRHEINRICH, ROGERS, and GRIFFIN, Circuit Judges.

ROGERS, Circuit Judge.   This case involves a defective mobile home, defectively installed such that the floor was two inches off level, for which the district court determined that revocation of acceptance was the proper remedy. Perhaps understandably in light of counsels' arguments, the district court's calculation of the amount to be recovered started with the amount that plaintiffs paid on their mortgage for the years in which they lived in the defective home. However, proper damages under a revocation-of-acceptance theory would be return of the original purchase price, brought to current value by prejudgment interest from the time of the sale to the time of judgment (to the extent permitted by law), plus any other compensable damages, less the value of the plaintiffs' use of the mobile home. The mortgage payments have little logical connection to these amounts. First, the relevant amounts would be the same regardless of whether there was even a mortgage in the first place. Second, the mortgage

payments were in substantial part for the land, the value of which had nothing to do with the defective home. The upshot is that the district court's calculation appears to have undercompensated the plaintiffs. A remand is necessary for a new calculation of the proper components of recovery on a revocation-of-acceptance theory. The parties in this cross-appeal make a number of additional arguments challenging various rulings of the district court. None of those additional arguments, however, has merit.

## I.

In 2004, the Bennetts' home in Rockvale, Tennessee, burned down. They went searching for a replacement and ended up on CMH's lot. While there, the Bennetts spoke with a CMH sales agent named Linda Haun and allegedly told her that they were concerned about the quality of a manufactured home. Ms. Haun allegedly told the Bennetts that a manufactured home (coincidentally, the type of home the Bennetts were looking at on CMH's lot) would be "more durable and of a higher quality than a conventionally built home." With their concerns about manufactured homes alleviated, the Bennetts decided to purchase one from CMH.

This court's previous opinion laid out additional relevant facts:

As part of the sales agreements, [CMH] was responsible for "normal delivery and installation" of the new home on the [Bennetts]' land. Further, [CMH] warranted that, "[f]or new homes, installation at the initial homesite will be completed in accordance with applicable governmental requirements."

[CMH] delivered the home in three pieces and installed it in March 2005, although much of the installation process remains a mystery. At trial, only one of the several members of the installation crew was identified. He was not licensed to install manufactured homes as required by the State of Tennessee. *See* T.C.A. § 68–126–404(a) . . . .

[The Bennetts] immediately began noticing defects that suggested the home was not level when installed, and they notified [CMH] before they closed on the house. [CMH] assured [the Bennetts] that it would repair and level the home, and [the Bennetts] closed on the home in reliance on defendant's assurances.

*Bennett v. CMH Homes, Inc.*, 770 F.3d 511, 512 (6th Cir. 2014).

So began the back-and-forth between the Bennetts and CMH. On June 17, 2005, approximately one month after closing, the Bennetts submitted a written complaint to CMH that contained thirty-five issues with the home. Among the alleged defects: the gutters were not level and would cause water to overflow and run down the side of the house; the decks on the house were damaged; the house was "wavy," including the roof; the front and back doors did not close properly; and there were cracks in the foundation.

The Bennetts believed these issues were due to the fact that the house was "crooked." In November 2006, state inspectors John Davis and Ray Henderson inspected the home and reported that "[t]he home [was] more than two inches out of level."

Over the subsequent two years, the defects persisted without remedy. The Bennetts spoke with CMH representatives multiple times and expressed their frustration with the problems. CMH representatives made trips out to the home but never actually fixed the levelling of the house. On December 6, 2007, a representative of CMH and Davis went to the home. The two stated at trial that they were accompanied by a third man, a Mr. Strong. Mr. Strong also testified that he was there and that, upon inspecting the house, he found it to be level.

The Bennetts filed suit against CMH a year later, alleging a number of claims. Among these were claims for intentional misrepresentation, breach of contract, and breach of warranty. CMH filed a motion for summary judgment on these claims. The district court awarded summary judgment to CMH on the claim for intentional misrepresentation, finding that Haun's statements were instances of "puffery" that are allowed under Tennessee law. The court denied summary judgment on the breach claims.

The case proceeded to a bench trial. The court "found that [CMH] had breached both the contract and its warranties by failing to properly install and level the house, and also by failing to install the house . . . us[ing] installers who were licensed as required by Tennessee law." *Bennett*, 770 F.3d at 513–14. The court, hoping the parties would settle, postponed ruling on damages. *Id.* at 514.

The parties could not resolve the case on their own, so the district court eventually ruled on damages. At the outset, the court held that a damages-limitation provision in the sales agreement was procedurally and substantively unconscionable due to its one-sided and overly harsh nature. Regarding the proper remedy for the breaches, the court stated that revocation of acceptance was the most equitable option. The court found that the Bennetts, by consistently reporting the significant number of problems with the house and by having buyback conversations with CMH, adequately revoked their acceptance within a reasonable time to avail themselves of the revocation remedy.

The court, however, did not award the Bennetts all of the damages they sought. The court used as its benchmark for damages the Bennetts' $1,400 monthly mortgage payment. The court determined that the Bennetts derived a benefit amounting to $1,000 per month by living in the defective house, and set off the $1,400 mortgage payment by the $1,000 benefit to arrive at the Bennetts' rescission-damages total of $400 per month. The court then multiplied this amount by the relevant number of months to reach a total award of $35,200. The court found that this sum included interest payments and, because the Bennetts would have paid interest on a home in any event, denied the Bennetts' request for the $80,000 in interest they had paid on the mortgage. The Bennetts' miscellaneous expenses of $4,038.29, which represented reasonable expenses, were granted, which brought the damages total to $39,238.29. The court

denied any damages for lost wages or "future expenses." Punitive damages, according to the district court, were also not appropriate in this case. As a final measure, the court awarded prejudgment interest to the Bennetts at a flat 10% rate, totaling $3,923.82. The district court thus awarded the Bennetts $39,238.29 in damages and $3,923.82 in prejudgment interest.

The Bennetts filed this appeal and argue that the district court erred in awarding summary judgment to CMH on the intentional misrepresentation claim, and that the damages award should have been greater. CMH filed a cross-appeal and argues that the district court's finding of liability was in error. The district court's damages calculation used an improper benchmark, thus requiring a remand. Prejudgment interest will also need to be adjusted. We uphold, however, the district court's decisions with respect to the remaining issues raised on appeal.

**II.**

The benchmark for the court's damages calculation should have been the purchase price of the home rather than the Bennetts' $1,400 mortgage payment. In determining that the Bennetts were entitled to $35,200 in damages, the district court took the monthly mortgage payment of $1,400 and subtracted $1,000 per month. The court then multiplied $400 by 88 (the number of months the Bennetts had lived in the house, minus the two months between the close of the bench trial and the damages calculation) to reach the $35,200 amount. The $1,400 monthly mortgage payments, however, are irrelevant for the purposes of calculating damages for revocation of acceptance, or rescission. "A purchaser . . . , upon rescission, is allowed to recover the consideration or purchase price which he paid for the property." *Isaacs v. Bokor*, 566 S.W.2d 532, 538 (Tenn. 1978); *see also Simmons v. Evans*, 206 S.W.2d 295, 297 (Tenn. 1947). We have been presented no authority suggesting that a case involving a mortgage is an exception to this rule. The $1,400 monthly sum is neither the consideration nor the purchase

price paid for the house; it is a monthly payment to a third party that contemplates both interest on the mortgage and the price paid for the land on which the defective house sits. The amount of the mortgage payments may also reflect such irrelevant factors as the term of the mortgage loan and the creditworthiness of the borrower. The correct benchmark for damages is instead the purchase price of the house: $109,597.57.

The award of prejudgment interest must accordingly also be revisited. The district court awarded the Bennetts prejudgment interest at a flat rate of 10% for the entire period of over seven years. This, under the previous award, came out to $3,923.82. That amount, however, is in no way correlated to the time value of the $109,597.57, restoration of which is the purpose of prejudgment interest, *see Myint v. Allstate Insurance Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). Had the Bennetts kept the entire $109,597.57 for themselves, they might have invested the money and earned a sizable return. In fact, they paid substantial mortgage interest to borrow the money. That being said, "[t]he award of prejudgment interest is within the sound discretion of the trial court," *L–S Industries, Inc. v. Matlack*, 448 F. App'x 597, 598 (6th Cir. 2012).

Further, the benefit derived by the Bennetts from use of the defective house should also be revisited on remand. The district court determined a value to the Bennetts of $1,000 per month—a remarkably high sum in light of the many problems with the mobile home—with little elaboration as to how that amount was determined. The court did note correctly that local apartment rental prices, as to which there was some testimony, were "not ideal figures for comparison purposes because the mortgage payment included interest, and both [apartment rental] figures are based upon a residence being in good . . . condition, which Plaintiffs' home is not." In addition, a rental price presumably covers land value, which the use of the mobile home on plaintiffs' land does not. While we do not hold as a matter of law that $1,000/month is too

much for the rental of a mobile home in as bad shape as the one in this case, the court, in reexamining the value to the Bennetts of the mobile home, should provide a fuller explanation and may in its discretion consider additional evidence or testimony.

**III.**

The parties' challenges to the district court's remaining conclusions are without merit and are addressed in turn.

A.

CMH appeals the district court's conclusions that CMH breached the sales agreement and its warranties, but sufficient evidence supports these conclusions. CMH argues at length that the process the district court used to find CMH liable was defective, including the burdens of proof and the court's consideration of certain testimony. There are multiple pieces of evidence in the record, however, that support the court's finding that the house was not level when installed. Davis's report from 2006 stating that the house was off level to the tune of two inches is just one piece. Although CMH argues that the district court disregarded Mr. Strong's testimony, the obvious explanation is that the court found that testimony to be outweighed by contrary evidence. Furthermore, that the house was not level is sufficient to find that CMH breached its contract and warranty in this case. The sales agreement between CMH and the Bennetts included installation of the house that would comply with "applicable government requirement[s.]" The record evidence supports the district court's conclusions that the faulty installation amounted to breaches of contract and the associated warranties, and the conclusions were therefore not clearly erroneous.

CMH also appeals the district court's choice of remedy, but revocation of acceptance is appropriate in this case. CMH argues on appeal that any offer it made to buy back the house was

in the context of settlement negotiations and therefore inadmissible. But Mr. Bennett's trial testimony renders this argument irrelevant: Mr. Bennett testified that he told CMH to buy his house back on December 6, 2007. The relevant question for the purpose of revocation of acceptance is whether the buyer(s) "d[id] some affirmative act in order to reject the goods." *Audio Visual Artistry v. Tanzer*, 403 S.W.3d 789, 806 (Tenn. Ct. App. 2012). *CMH*'s offers to buy back the house are thus of no consequence to the issue of whether *the Bennetts* acted affirmatively, and Mr. Bennett's testimony regarding his buy-back demand could reasonably be seen as an affirmative act. The Bennetts also provided CMH with many opportunities to cure the defects in the house, which buyers are required to do before they can avail themselves of the revocation-of-acceptance remedy, *see Samples v. Guerdon Industries, Inc.*, 1986 WL 10922, at *3 (Tenn. Ct. App. Oct. 7, 1986).[1]

With regard to the timeliness of the revocation, even if the district court used Mr. Bennett's statement from December 6, 2007 as its guidepost, that would be just over one year after the Bennetts learned of their house's lack of leveling. The district court's determination that the Bennetts timely revoked was made "[e]ven though [the revocation] occurred long after the home was placed on the property." Parties are required to revoke acceptance within a reasonable time, Tenn. Code Ann. § 47-2-608(2), and such reasonable-time requirements "defeat[] bad faith on the buyer's part and protect[] sellers against noncurable and dubious, stale claims as to accepted goods," *Duffy Tool & Stamping, Inc. v. Bosch Automotive Motor Systems Corp.*, 2000 WL 122225, at *3 (Tenn. Ct. App. Feb. 1, 2000). There is no record evidence suggesting that the Bennetts waited to revoke just so they could take advantage of CMH and unjustly reap the benefits of revocation. The district court properly concluded that revocation of

---

[1]Because the buyback demand is sufficient to support the district court's conclusion, this court need not reach CMH's argument regarding "punch lists."

acceptance was the appropriate remedy here, and the court's determination that the revocation was timely was not clearly erroneous.

CMH lastly argues that the district court erred in finding the damages-limitation provision in the settlement agreement unconscionable, but this argument is unpersuasive. The damages-limitation provision in the sales agreement states that "[CMH] will not be required to pay the [Bennetts] any incidental or consequential damages." CMH argues that it owes no incidental or consequential damages pursuant to this provision. The district court, however, stated that the "clause is wholly one-sided and overly harsh because it prohibits incidental and consequential damages in all cases." *Accord Sunny Indus., Inc. v. Rockwell Int'l Corp.*, 1999 WL 220109, at *12 (7th Cir. April 12, 1999). The provision in the sales agreement is indeed drastic, for it removes *all* incidental and consequential damages, and to include such a provision in a form agreement compiled without negotiation only supports the unconscionable nature of the provision. The district court properly rejected CMH's argument in this regard.

B.

The Bennetts appeal the district court's dismissal of the intentional misrepresentation claim, but because Haun's comments amounted to puffery, the district court's dismissal was correct. Ms. Haun's statements concerned the durability and quality of the type of home on the CMH lot, where she was attempting to sell homes. This type of comment falls squarely within the common understanding of "puffing or other sales talk," which is generally not actionable, *see McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982). "'Puffing' refers to loose general statements made by sellers in commending their products." *Daugherty v. Sony Elecs., Inc.*, 2006 WL 197090, at *9 (Tenn. Ct. App. Jan. 26, 2006). The Bennetts argue that Haun's statements were made with the intent to mislead them into buying the manufactured

home.  But Haun was simply commending her product, and stating that her product is better than another is akin to saying that it is the "best in the American market," which is puffing and not actionable in Tennessee.  *Id.*  "[A] buyer must 'exercise common sense' before relying on a seller's self-interested opinions."  *Morris Aviation, LLC, v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 562–63 (6th Cir. 2013) (quoting *Flegels, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (applying Kentucky law).  Ms. Haun's comments were certainly self-interested, and the Bennetts should have been more cautious in relying on them.  The district court's award of summary judgment to CMH on this claim was therefore proper.

Furthermore, the Bennetts' contention that the district court erred by setting off the Bennetts' award by the benefit they received is without merit.  The Bennetts cannot pay for a home, live in that home for a significant period of time, and then get their entire purchase price back.  "[S]etoff is an equitable doctrine, and [it] generally rests in the inherent authority of the court to do justice to the parties before it."  *Conister Trust Ltd. v. Boating Corp. of America*, 2002 WL 389864, at *20 (Tenn. Ct. App. Mar. 14, 2002).  The theory of a rescission remedy is to bring the parties to the position they would be in absent the contract.  *Stonecipher v. Estate of Gray*, 2001 WL 468673, at *5 (Tenn. Ct. App. May 4, 2001).  Absent the contract, the Bennetts would not have had the use of the (albeit defective) mobile home; the home—with all its deficiencies—was still the Bennetts' place of residence.  The district court was within its authority in deciding to reduce the award to account for the Bennetts' use of the mobile home.

The Bennetts are also not entitled to an award for the interest they paid on their mortgage. The district court's denial of damages here was not in error.  The amount of mortgage interest is based on the loan that the Bennetts negotiated with the mortgage company, and as explained above that agreement has little to do with CMH.  The most directly relevant place to compensate

the Bennetts for the time value of the money they originally paid for the now-rescinded purchase price is as part of accurately-determined pre-judgment interest, discussed above, and not as the interest actually paid for money borrowed from a third party for that and other purposes.

The Bennetts also challenge the district court's denial of an award for lost wages, but the district court reasonably rejected this claim. Because Mr. Bennett had to use six weeks of paid vacation to deal with CMH and the house problems, the Bennetts argue, he lost the opportunity to use these days at a later date, and they should accordingly be compensated. Mr. Bennett, however, was not the one actually attempting to fix the house on these dates. He therefore still derived the benefit of being paid while not having to work, which is the normal purpose of a paid vacation, even if it was spent at an off-level house instead of at a vacation spot.

Contrary to the Bennetts' argument on appeal, the district court also properly declined to award the Bennetts' damages for their future expenses. The Bennetts seek $25,250, which includes rent for a furnished apartment during the ten-month period that their new house will be built as well as $10,000 to move and store their furniture for that period. These sums were not supported by sufficient evidence at trial, even under the standard for future damages, which is lenient, *see Henley v. Amacher*, 2002 WL 100402, at *14 (Tenn. Ct. App. Jan. 24, 2002).

The Bennetts' final contention, assigning error to the district court's denial of mental anguish and punitive damages, fails. There is nothing in the record showing that the Bennetts suffered from "severe mental injury," which is necessary to recover for mental-anguish damages in breach cases, *see Rogers v. Louisville Land Co*., 367 S.W.3d 196, 209-10 (Tenn. 2012). Although the defects and subsequent song-and-dance from CMH naturally caused the Bennetts stress, damages for mental anguish are reserved for something more severe. Punitive damages are likewise inappropriate, for there is nothing in the record showing that CMH's breaches were

intentional. Although CMH went years without fixing the level of the house, CMH sent employees and contractors out to the house on multiple occasions to inspect it and do work. CMH thus was working with the Bennetts, although that work was lethargic and ultimately actionable for breach claims. "[C]ases involving fraud, malice, gross negligence, or oppression" are the instances when punitive damages in breach claims are appropriate. *Medley v. A.W. Chesterton Co.*, 912 S.W.2d 748, 753 (Tenn. Ct. App. 1995). The district court reasonably concluded that CMH's conduct did not sink to that level.

## IV.

The judgment of the district court is accordingly affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

**SUHRHEINRICH**, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's resolution of all the issues in this appeal with the exception of (1) allowing CMH a setoff for the rental value of defective home while the Bennetts lived there, and (2) denying the Bennetts an award for the amount of interest they paid on their mortgage.

Under Tennessee law, setoff is an "equitable doctrine" and "therefore, will not be allowed where to do so would work injustice." *Conister Tr. Ltd. v. Boating Corp. of Am.*, 2002 WL 389864, at *20 (Tenn. Ct. App. Mar. 14, 2002); *see also Moore v. Howard Pontiac-Am., Inc.*, 492 S.W.2d 227, 230 (Tenn. Ct. App. 1972) (authorizing setoff only where "complete justice and equity cannot [otherwise] be meted to the parties"). In this case, I believe that granting CMH a setoff would be inequitable. The Bennetts revoked acceptance of the defective house, but CMH never fulfilled its promises to repair the house and never bought the house back, thereby prolonging the amount of time the Bennetts continued to live there. Yet under the majority's analysis, CMH would be entitled to a setoff even if CMH had dragged on the dispute so long that the rental value of the house eventually exceeded its purchase price, leaving the Bennetts with no recovery even though CMH is the party at fault. Although the district court's calculation of the rental value did not completely offset the Bennetts' recovery, CMH's "repeated failed assurances and repeated failures to cure" still effectively minimized its liability by prolonging the amount of time the Bennetts "rented" the defective home. [R. 183]. Applying setoff in this case thus rewards CMH for breaching its contract with the Bennetts.

A setoff in this case is also incompatible with CMH's actual losses. In Tennessee, the party asserting a claim of setoff has the burden of establishing the right to and amount of setoff. *Conister*, 2002 WL 38964 at *20; *Midwest Bronze, Inc. v. Outlaw Aircraft Sales, Inc.*, 1999 WL 92652, at *3 (Tenn. Ct. App. Feb. 24, 1999). In my view, CMH failed to meet its burden of

proof to establish the existence and amount of loss stemming from the Bennetts' occupation of the house. The majority acknowledges that the district court reached the "remarkably high" rental value of $1,000/month "with little elaboration." The majority therefore authorizes the district court on remand to "consider additional evidence or testimony" regarding the rental value of the defective house. Yet it appears that the very reason the district court's decision lacked "elaboration" is because CMH failed to produce any evidence at trial regarding its losses or the rental value of the defective house. In fact, the only evidence the district court cited in awarding a setoff was *Mrs. Bennett's testimony* about prices for apartments in a nearby city. R. 183. CMH did not actually assert a right to a setoff until its post-trial brief. R. 171. In any event, it is doubtful that CMH suffered any actual losses from the Bennetts occupying the defective house during the time that CMH failed to repair it or buy it back. Had the Bennetts elected to rent a different home due to the house's defects, CMH would not be entitled to recover rent from the Bennetts; in fact, CMH would arguably be obligated to reimburse the Bennetts for rent payments made to a third party. At the very least, CMH is not in a worse position because the Bennetts chose to stay in the defective house rather than rent another place. Under this analysis the Bennetts had to pay mortgage payments plus rent payments in the form of a setoff. At the same time, CMH had been paid in full for a defective house and had the use of that money. We should not punish the Bennetts for making the best of a bad situation, especially when CMH has made no showing that the Bennetts' occupation of the house reduced the house's resale value or otherwise caused CMH loss.

I also disagree that the Bennetts were not entitled to an award for the interest they paid on their mortgage. The district court denied the Bennetts' request for interest on the ground that the Bennetts would have had to pay interest even if the house was not defective. This does not

follow if at the same time they were required to pay $1,000 a month rent in the form of a setoff. In other words, the district court found that CMH's breach of contract did not proximately cause the Bennetts' interest payments. This logic overlooks the fact that the Bennetts timely revoked acceptance of the house. As a result, they no longer have the investment that the interest payments financed. *See Nachazel v. Miraco Mfg.*, 432 N.W.2d 158, 161-64 (Iowa 1988) (allowing recovery of interest where the buyer seeks rescission of the contract because "[w]asted expenses for interest can result when the buyer does not keep the defective goods"). Although the Bennetts' decision to obtain a mortgage was not a result of CMH's breach, the loss of their investment was a result of CMH's breach. Because they no longer own the defective home, they have nothing to show for their $80,000 in interest payments.[1] Thus, by not awarding the Bennetts interest, the district court did not return them to the position they occupied prior to the transaction, which is the goal of awarding rescission as a remedy. *See Lamons v. Chamberlain*, 909 S.W.2d 795, 800 (Tenn. Ct. App. 1993) (quoting *Williamson v. Upchurch*, 768 S.W.2d 265, 271 (Tenn. Ct. App. 1988)). Moreover, awarding the interest payments would not unfairly surprise CMH because the cost of interest is readily foreseeable for a transaction of this nature and amount. *See Carl Beasley Ford, Inc. v. Burroughs Corp.*, 361 F. Supp. 325, 334 (E.D. Pa. 1973) (allowing jury to award interest charges paid by the plaintiff for purchase of defective computer system because "the nature and price of this equipment was such that . . . '[the defendant] had reason to know' that plaintiff would borrow money to purchase the capital item"); *Bobb Forest Prods., Inc. v. Morbark Indus., Inc.*, 783 N.E.2d 560, 579 (Ohio Ct. App. 2002) ("[I]f the nature and price of the product the buyer purchases from the seller is such that

---

[1] Although some of this amount in interest may have financed the purchase of the land where the house was installed, the district court could have determined what portion of the interest financed the purchase of the house rather than the land.

. . . the seller has reason to know that the buyer would borrow money to purchase the product, then the interest on the loan used to purchase the [goods] may be recovered.").

While I concede the majority's point that an award of pre-judgment interest could compensate the Bennetts for the lost time value of their money, the simple fact is that the district court's award did not accomplish that. Therefore, I would correct the district court's error regarding the award of interest rather than impinge the district court's greater discretion regarding pre-judgment interest. *See Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 333 (6th Cir. 2007) (reviewing award of prejudgment interest for abuse of discretion).

One final point. The majority expresses concern that the district court's calculation "undercompensated the plaintiffs." I share that concern, but I have serious misgivings that the majority opinion's overall resolution of this case will solve that problem. This is because the only damages decision the majority firmly reverses is using the total amount of the Bennetts' mortgage payments rather than the purchase price as the starting point for calculating damages. Ironically, the amount of mortgage payments made by the Bennetts ($123,200) exceeds the total purchase price for the house ($109,597.57). Thus, all other things being equal, the district court's error in this regard actually benefited the Bennetts. If, on remand, the district court adheres to its setoff amount of $1000/month and its restrictive approach to pre-judgment interest, neither of which the majority opinion forbids, the Bennetts' damages will be even lower than they were before this appeal.

As it stands, the Bennetts will receive $113,635 before prejudgment interest ($109,597 purchase price + $4,038 in miscellaneous expenses), but they have no house, they owe CMH

$88,000 for rent,[2] and they claim they still owe $102,000 in principal on the house-related portion of their mortgage. [R. 186]. CMH, on the other hand, has the house (which, assuming it's worth only half of its original value, is worth about $55,000), will receive $88,000 in rent from the Bennetts, and owes the Bennetts only $113,635 before prejudgment interest. In sum, before prejudgment interest, the Bennetts are left with a liability of $76,365, while CMH gains a net of $29,365. Although these numbers are not exact, they demonstrate that the overall damages award places the wrongdoer in a better position than the victim. And in an equity proceeding, the wrongdoer should not be rewarded at the expense of the injured party. I believe that we could achieve a more equitable outcome by denying CMH a setoff and granting the Bennetts an award for interest.

---

[2] The Bennetts will not actually transfer this amount to CMH, but it will be offset against the $113,635 owed to them from CMH. So, it is a price they effectively must pay to CMH.